Good morning, Your Honors. May it please the Court and Counsel, my name is Leslie Barnes. This may come as a great surprise to you because there's a microphone in front of you, but it's really not a very good microphone. And you really have to just be like one of those Las Vegas entertainers and get it up there. So we want to hear everything you have to say. Thank you. I will do that, Your Honor. I'm going to address the double jeopardy issue on behalf of the four appellants. And what we would like to do is reserve five minutes at the end collectively for our rebuttal. Any issues that we don't discuss at the podium today, we just want to submit on our brief. And we understand, of course, that nothing that isn't discussed here is waived. We just want to focus our discussion. So we'll consider all of the issues that have been briefed. Thank you, Your Honor. I want to start out by talking about the procedural matter having to do with the double jeopardy in terms of the court's order that found that our motion to dismiss the indictment based on the double jeopardy grounds was filed untimely. And the court discussed a couple of different timeframes, whether it should have been a motion for reconsideration within 10 days or a motion for interlocutory appeal within 30 days. But based on the case of United States v. Gamble, the court clearly erred in finding that the motion was filed untimely. It was filed after the mistrial in the first case, but about a month and a half before the second trial came, before the jury was empaneled. And the Gamble case indicates that an appeal on double jeopardy grounds could be raised even after a conviction in the second case. So it is... Yeah, I should say that I read the government's footnote 10 as being a soft concession on this issue. So perhaps you could move to the merits. Perfect. Thank you, Your Honor. Your Honor, in terms of the merits, again, the timeframe is critical in determining the merits. This trial started and the motions were litigated on the, I believe it was the second day of trial, while the jury was being empaneled. Very vigorously litigated was the motion about not allowing in evidence or testimony about Mr. Horovodugo's guilty plea from his prior case, which was in January of 2003. The government indicated that it had no intention of bringing in that guilty plea. Well, that's the crucial question, isn't it? If it was inadvertent and counter to the prosecutor's instructions to the witness, then the retrial was permissible. So we have the district court here finding, I think, I should also mention for the record that I think what happened with the witness was a result of mistake and inadvertence. I cannot find any government misconduct. I will, and skipping some pages, I will find that the testimony was inadvertent, non-responsive to the question put by the government attorney, and therefore not based on government misconduct. Why is that clearly erroneous? And if it is not, what happens to your argument? Well, Your Honor, there's a couple of problems with this. One is that we don't really know any of those things. There was no evidentiary hearing. Did you request one? We did not request one, obviously. It would have been a lot better if we would have requested an evidentiary hearing. Well, you said in court, though, it's quite, in a sense, this is invited error if it's error at all. You said to the district court, I'm going to make an assumption, knowing Mr. Kern, that this agent was probably instructed not to testify about that. And one of the other counsel said, it's not Mr. Kern's fault that the jury is gone. So there seemed to be a recognition by defense counsel that it was inadvertent, or at least no indication to the trial court that it better inquire. So, you know, why aren't you stuck? Well, our position is that those comments were made in the heat of the moment, probably should not have been made, and were somewhat gratuitous. But none of us knew what was happening. I'm not talking about judicial or something. What was happening there. They are somewhat reflective. On behalf of counsel for Lorena Harrow and for Mr. Burgos Valencia, obviously they didn't speak up at all. They didn't join in those comments. So at least on their behalf, they didn't indicate to the court they thought that there was no error. I'm really not even talking so much about a formal doctrine like judicial estoppel or waiver. But I'm really talking about, in a sense, what Judge Wallace was bringing up. If the trial court hears no request for an evidentiary hearing, and the only substantive or quasi-substantive comments seem to be in accord with, you know, finding any intentional misconduct, why would the court, sua sponte, have to, in pain of everything falling apart, have to order an evidentiary hearing? I don't think the court would, at that point, have had to order an evidentiary hearing. It would have been better form to say, would the parties like to be heard, or could we develop the record? And I think it's important to note that at other points during this trial, and the pretrial issues, that's what the court did almost every single time. Would you like to make a record? Would the parties like to be heard? What's your position? Well, when the courts made the comment about this, saying, I think what happened with the misconduct, the court goes through a long thing and then says, what are people's thoughts on trial dates? And everybody says, no speedy trial problem. Nobody questioned that finding. Nobody said, well, wait a minute, how do you know that? Or, I have a problem with that, or anything. There was an opportunity to speak, but... Well, Your Honor, again, obviously, it would have been much better had we done exactly that. But what we did do, we'd been working very closely on this case all for counsel. And we met immediately after that and started discussing it. We ordered transcripts the next business day. We started doing some research. We made a request in writing to the prosecutor, asking if we could discuss this with the agent to try to figure out what happened. We actually did move on it pretty quickly, although not right at the moment. The other matter is that I think there's an issue about whether or not the conduct was intentional on the part of the agent. And as far as our research, it appears that that issue has not been decided by this court. Well, isn't that all... How is that raised and unpacked from just whether the testimony or the proceeding was intentional on the part of the prosecution? How is that argued to the district court? Well, although it wasn't very clear, when I made my comment that the prosecutor had instructed the witness, the rest of that thought was, and he did this anyway. But, you know, now we're kind of speculation on speculation here at the Court of Appeals. It seems part of it, you said, well, they had a sinking ship and so in a way they got lucky. But we don't really have evidence of any intentionality, do we? Well, the only real evidence is going to be circumstantial. The case was a fiasco for the government. We've all tried a lot of cases in U.S. District Court and discussed it extensively and had really not seen a case start out like that. It was very early in the case, granted, but things were going very poorly for the government. We were prevailing on our motions in limine. There was a disclosure. Then why didn't you argue against a mistrial if you were so happy with the way things were going? Because the court would not have had to have a mistrial, could have easily just given a cautionary instruction to the jury and moved on. Well, I don't think the court could have easily given a cautionary instruction. This was a huge and very prejudicial error. Well, you know, you're arguing sort of both things. It was going really well for the defendants. We were going to win. But, hey, this, you know, three words out of this guy's mouth were so prejudicial that even though it was going terribly for the government, it now was going wonderfully for the government. And that, of course, undercuts your initial argument that it just seems that I just think it's very hard for us to find a way to give relief on appeal when it was not, when the district court wasn't given the appropriate opportunity by way of objections or requests for what do you think we should do? Well, what's your point? My point is that at a minimum, this case should be remanded back to the district court. For what? For some findings where the parties are prepared for an evidentiary hearing on whether or not the prosecutor was improper when already before this long trial, there's already been a finding made by the district court and no request for an evidentiary hearing. Now you want to unravel all of that after a long trial and go back and see whether or not, in fact, that the prosecutor was conducting himself improperly. It seems to me that it's a little difficult to go back and do that, especially when counsel had every opportunity at the very beginning to ask for an evidentiary hearing. And there's nothing in here that shows that I've seen, maybe you could argue me out of this, but I'm not persuaded so far from what I've read that the district court was clearly erroneous in finding that there was no inappropriate conduct on the part of the prosecutor. There's no other evidence. There's a lot of things that you put into a piece of paper called a brief, but there's no evidence to show that is clearly erroneous. So I'm having difficulty knowing how to sort this one out. Your Honor, two things. One is we did ask for an evidentiary hearing prior to the second big long trial and the first trial mistried after only a few days. This could have been handled before the five-week trial occurred. So when was this motion for an evidentiary hearing made? We filed the motion on February 6th. Of what year? Because the original trial was a couple years ago. Right. I'm sorry. It was February 6th of 2008. That's when we filed our motion to dismiss. The government responded. We replied. All the transcripts were prepared. We assumed that when the court set the hearing on March 10th, we were all prepared to walk in the door and litigate this issue. On February 29th of 2008, we get the order saying it's denied, it was untimely. We still thought that when we went in on March 10th, which was the case because the district court did bring it up before we discussed anything about the new trial, we went in there and the court said, well, first we need to deal with this motion to dismiss. And again, he told us that it was filed untimely, which was clearly erroneous. It wasn't filed untimely. That would have resolved what Your Honor is concerned about. Why should we go backwards now after the big long trial? When you said in your brief, here's the reasons that one could find intent. And so if we go through theirs, I'm not sure why you'd need an evidentiary hearing. One, you said that this prosecutor, this AUSA, has extensive experience. We really don't need a hearing on that. I mean, that's a fact, right? And you have to decide what you infer from that. You said the case wasn't ready for trial. Well, the judge was there observing what the judge observed, so I don't know what the evidentiary hearing did there. Solis was a co-case agent. That's an established fact. Prosecutor's case in chief was going badly. We've kind of talked about that, how that cuts one way or the other. Let's just assume it was going poorly and there was a trial and also then joined in the motion. That's a stated fact, so we wouldn't need a hearing on that. And then the violation that provoked the mistrial was severe. That is, it is what it is. So I'm not sure how even the grounds that you argue how an evidentiary hearing would get you more information for the judge to put this in his constellation. Maybe you can help me out on that. Well, again, the most obvious, as one of you mentioned in another case, the white elephant in the room is what really happened? Did the prosecutor, who has an obligation to advise his witnesses what to testify about and what not to testify about, did he do that? If he did, did the agent intentionally ignore that? It was only ordered the day before the testimony. I also think it's really an important point that the prosecutor joined in this motion because it makes it a little bit of a hybrid type of case. This isn't like the other cases that we read and that we mentioned in the brief where the defendants move for a mistrial and the prosecutor vigorously opposes it. I guess the other thing that the court had was the question itself, which was about as bland a question as one can imagine. What else did you do with respect to the case? It asks what the person himself did. There's no sort of convoluted anything in it. It's a perfectly clear question. And then the court intervenes and says, you know, the question was what you did. And Mr. Kern says, yeah, that's what I'm trying to get at. And so I'm not sure what you'd have to infer that everybody was in cahoots somehow for this even to warrant further inquiry. Your Honor, I have a couple of thoughts on that. And then I don't want to cut off the questioning, but I don't want to step on the toes of my co-counsel. In terms of that, there's a couple of things. One is the, I think that there is vindictiveness shown in the answer of the agent. First of all, he brings up the matter that the passenger is a juvenile, probably intend to inflame the jury, possibly even thinking ahead to a sentencing enhancement. He starts talking about what happened with that. Then he starts talking about what happened with Mr. Jaro Verdugo. I think the prosecutor had an obligation, first of all, to pay attention to where that witness was going. And second of all, to lead him... Well, he did. I mean, everything else was, you know, one word answers. At times it's forfeited, drug evidence, yes. These were very small answers. And then he asks this question, what did you do? And he goes off on this other area that seems unresponsive. I think the prosecutor knew that he was getting close to a dangerous area and I think he had a responsibility to more carefully lead him through that. It's just so hard to imagine why this happened since it was so vigorously litigated just the day before. And that's where we think we need an evidentiary hearing. And again, Your Honors, I apologize for cutting this short, but I do want to leave some time for my colleagues. Sure. Thank you. Good morning. My name is Steve Rawson. I represent Mr. Burgos. Who do you represent? Mr. Burgos. I think there are five facts that are very important concerning the CCE count. One, there were 7,000 calls. Of the 7,000 calls, Mr. Burgos was heard in only 32 of them. Two, the notebook that was found in Sergio Otto's house was a drug ledger for which the government was able to tie in some of the substantive counts. The third is that there was no cooperating witness that had ever heard, seen, or spoken to Mr. Burgos. Fourth, Mr. Burgos was never seen at any of the locations under investigation by the government agents. And five, that the government agents had only seen Mr. Burgos briefly in the United States on three separate occasions. I think probably the most telling of the evidence that the government had concerning the CCE came on trial day 14 in which Agent Amarillas testified. And Agent Amarillas testified that he learned that Sergio Otto answered to Burgos. An objection was raised by myself at that time. We held a sidebar. I complained that there had been no evidence had been brought forth that Sergio to the tenor of the conversations, unquote, that being that the tenor of conversations indicated that possibly Sergio Otto answered to Burgos. The court did not accept that statement from the government. I moved for a mistrial. The court rejected my motion for a mistrial, said that they would give a limiting instruction to the jury to completely disregard that Sergio to the tenor. The other thing is that at the time that I moved for the mistrial in this case, Rule 29, I'm sorry, Rule 29 when we spoke, the court said that they had serious doubts whether the government could prove the elements, in particular the managerial role. I think the court was correct in that. The court also stated, quote, I can't find that he is a supervisor as unquote. Then the government began to argue the vicarious liability that you see under Pinkerton rule and persuaded the court. The court finished the Rule 29 motion by stating, quote, what I was looking at was kind of vicarious liability responding superior when there is an exercise of control over supervision of somebody or the right to control them. I did not think about an aspect of the case, and so accordingly I am denying the motion as to count ten, unquote. The court was correct in its first assessment in this case. The court was right. Well, is your argument a legal argument or a factual argument? In other words, I know you don't agree with this assumption, but I'm trying to test whether this is a legal or a factual argument. If your client managed or controlled Sergio and he in turn controlled four or more others, then does that satisfy the five, or are you making a legal argument that it has to be personal and direct as to all five, or are you making a factual argument that even if it's a legal argument, you're making a factual argument? Well, I'm making both a legal argument and a factual argument. Legally, it's not there. But for what reason? Is it because if A controls B and B controls four or more people, does that suffice? Well, A does not control... Please answer as a theoretical matter. I know you don't agree with the assumption that's behind the assumption that A controls four other people. Is A responsible for five or more people? Not under the CCE statute. Okay, so you do disagree. I disagree with that. I think under the law of conspiracy, you're correct. I think under the law of continuing criminal enterprise, that's not what the courts have held. There has to be some managerial position in this case, and there isn't any. I don't think that there's any managerial position in this, and I think the government basically argued the conspiracy law in their closing argument when they went before the grand jury, basically arguing to the jury that if Sergio has five employees and Sergio answers to Burgos, then there are six employees, and that's incorrect. I think under the law of conspiracy, I think you can read it that way. Under the law of CCE, you can't. I want to make sure because that's an important point. He has to manage each one, and there can't be any delegation. Is that your point? I'm sorry. He needs to get the five. He needs to manage each one, and there can't be delegation of management. Is that your point? Well, I think there can be delegation of management, and I don't think it has to be at the same time. There has to be some showing that there is that management of those individuals. I don't think there's ever been that showing. Okay. Well, those individuals, does that mean there has to be management of Sergio or management somehow directly of each individual? I think there has to be some showing that he had the authority to manage the individuals that worked under Sergio, for instance. Okay. And I don't want to take time away from the other panels. You're closing in on it. How many other issues are you wanting to argue before we get to the rebuttal? There's four minutes. I better quit. Good morning. I'm Ralph Ellenwood, and I'm here for Sergio Haro. I plan to primarily address the problem of the case agent testifying both as an expert and a lay witness. What we have here is a case which was, it seems, predicted by the Freeman case and compounded into really a terrible situation for the trial court as well as the defense by the complete failure to comply with Rule 16G. The case agent in this case, Amarillas, had been involved before there were even indictments in this case. He was the Title III affiant, and as Mr. Kern, the prosecutor, had also been involved a long time pre-indictment. So it's not as if Agent Amarillas was unknown or there was some reason to delay disclosure of the intent to use him as an expert as well as a lay witness. But despite that, the first indication that anyone had, and by anyone, I include Judge Burry, was when the government filed its trial brief on November the 19th of 07. And that just simply alluded to the fact that they were going to use him to talk about drug speak. At that point, there hadn't been even any formal expert notice. In response to that trial brief, Julio Haro filed a motion in limine on November the 26th of 07. That same day, but later, the government filed its notice of expert. But the notice of expert didn't comply in any way with Rule 16G. Let's say that there were some rule violations and that there was some mixing and matching here and that Freeman foreshadowed. What was the specific prejudice and what do you with was totally unable to know what the opinions were of Agent Amarillas or the basis, the reasons for those opinions? The rule itself doesn't call for opinions. Rule 16 doesn't say you have to give notice of opinions. It says describe the opinions and the 16A, the subsection of 16A. I'm sorry, AG. But what ultimately happens here is he's talking about what these drug boards mean, right? Well, that was the pitch, but it went far, far beyond that. And to get back to the prejudice, not only did it directly impact our ability as defense counsel to confront, cross-examine, anticipate, make timely objections, effective assistance issues, due process issues, but it completely made it impossible for Judge Burry to exercise his gatekeeper function under Freeman because he didn't know what was coming and because of the very untimely raising of this issue just days before we were to impanel a jury for a lengthy trial, there really was no time to litigate any of this and give the judge an opportunity to see what was coming. I guess where would you go with litigating it? I mean, it's quite typical in these cases that people don't call each other and say, hi, I'm sending you 10 kilos of marijuana. They'll say, I'm sending you a washing machine or I'm sending you this or that. And that happens in every one of these cases. So I'm not sure, had you litigated it, where would you have gotten with it? Well, the first thing, had there been proper notice, is that I think the defense would have clearly gotten an expert of their own to start with. Secondly, it would have given us an opportunity to say to the judge, well, we're not supposed to be the experts, not supposed to ad hoc opinion based on the facts of the case. You're supposed to give an opinion based on the expertise of experience in these kind of cases. And what we have here is... Well, you could have done this without an expert. The government could have presumably not even qualified him as an expert and gotten pretty much the same place for the reason that I was just suggesting that in context, just as a case agent, they would have an experience that people don't name drugs, but they use all these other kinds of... I'm not sure where you would have gotten with your own expert or... Well, I disagree. The difference between seven... What would the experts say? Hypothetical experts. The difference... Well, our expert presumably would have been an ex-DEA agent who would be testifying, yes, in the context of the wider scope of investigation of these kind of cases, much like a Title III expert for the defense. These words would not have meant what Agent Amoreus is saying that they do mean. But I think the confusion here is to confuse between Rule 701 and 702, because while 701 has to do with lay witnesses, the 2000 Amendment specifically says that this would eliminate the risk that the 702 reliability requirements will be evaded by offering an expert in lay witness clothing, which I think is exactly the situation that Judge Graber was making mention to, that he could do this as a lay witness. And I submit, no, he couldn't. In fact, that would be highly inappropriate. So you have a mandatory duty to disclose, and it's not done... Well, to the extent that you knew at the time of the trial memorandum that there would be this and that this is an issue that comes up in almost every drug-related trial, it just... I don't know why... Was there an effort made to retain an expert? Was there a request for continuance to retain a counter-expert? Was there anything like that that would have specifically alerted the court that you weren't going to be ready? Yes. The motion in limine that was filed November the 26th specifically set out what the problems were. Well, the focus of that was... The focus of that motion, I thought, was saying that a person had to have only one capacity, couldn't be both an expert and a lay witness. Am I wrong about that? I think you are. I don't recall anything... I may be wrong about that. There's a lot in this case. I agree with you, Judge Graber. There's an awful lot. But the problem is that by dumping this on the defense and on Judge Bury at the absolute last moment... Compare it with the W.R. Grace case, which I cited in the 28J letter just for the proposition that the Rule 16 expert disclosure is mandatory. But in that case, if memory serves, the expert disclosure was made way before trial because the judge ordered it way before trial, and thus giving time. But in the Grace case, the issue wasn't the expert. It was the lay witness disclosure, which this court held was perfectly appropriate in these large, complex cases, that the trial judge was perfectly appropriate to order that. Could I squeeze a question in? I've found what I wanted. The rule requires not the witness's opinions, but a summary of the witness's opinions. Now, other circuits have chosen to define that more specifically than we have. We have left it just with a rule, summary of the witness's opinions. As I understand it, the document of its, whatever it was called, summary of this case, that you had sufficient notice. Now, what do we test that determination that the parties had sufficient notice based upon the Rule 16 and the trial proposal of the government? What's the test? Well, I don't know in the context of this case because, first of all, I don't think Judge Bury did rule that we had sufficient notice. He said, I will rule on this when I hear the testimony. Well, he also said you had sufficient notice. I've read that in the transcript. Well, to the extent that there was a ruling on the notice, I think that Judge Bury clearly erred because there was no notice. That's what I'm asking you. Is the standard review error? I think it's abusive discretion. It's what? Abusive discretion. Abusive discretion. How and what way would you set aside that abusive, prove that's an abusive discretion? What happened during the trial that showed the district judge abused his discretion when he said you had sufficient notice? Well, the battle started with the confidential informant body wires in which Agent Amarius was interpreting words like guys, entrance, soldiers, exporting cars, animals and cows, calves, stats, ordinary words, which in the context of these wires could have well had ordinary meaning. So what you're saying is what happened after he ruled shows there was an abuse. But what was there at the time he ruled that showed it was an abusive discretion to say you had sufficient? Because there was no notice at all. We had no summary of his opinion that there was a summary. There was a trial brief. You can't say there's no notice at all. Can you? I can indeed. I don't see how saying that a person's going to talk about drug jargon can properly be considered Rule 16 disclosure of summary of the answer. That was not my question. I'm sorry. I misunderstood. My question was with what you had, the district court ruled that you had sufficient notice. And you, and I've asked you, how do you then demonstrate that was an abusive discretion? You went on to say what happened later, but at the time that it occurred, why was that an abusive discretion? Because there was no notice at all. How can it be sufficient if there's no mandatory Rule 16 disclosure of summaries, the basis for the opinion at all? Okay. If that's your position, then I understand. And we're going to allow Mr. Higgins opportunity. I assume he still has something new to add here. I will get right to it. My name is Tom Higgins. I'm Lorraine Otto's attorney. Lorraine Otto is Ms. Bowman's attorney's wife, Mr. Leo Otto. We both requested mere presence instructions. Both were denied. These comments apply equally to hers as well. The evolution of the cases in this circuit, roughly start with Escobar de Bright in 1984 that basically says you're entitled to your instruction if there is some foundation in the evidence. That actually evolved in 1989 to Murillo, which basically held that even if the evidence is weak, inconsequential, or possibly doubtful credibility, the instruction should be given. The trial judge and the government in their brief responded this way. Under Morton, or excuse me, Mason, U.S. v. Mason, we don't have to, the judge doesn't have to give an instruction that is not, that is covered by other instructions. So the question then is, where did it come in? The trial judge indicated that he instructed on the charges and that covered and was enough of a safeguard for mere presence when he denied it. Let me ask you the other question that concerns me, and that is, is there an error in refusing to give a mere presence instruction if there, if the court below concludes that there was significant evidence in addition to mere presence, that that is, it's not supported by the record? And there is language in there from where your Honor's question came from. It is, there wasn't anything specifically about that. Judge Murray. I guess I want to separate it out into, is that a legal question and a factual question? If there's additional evidence in a hypothetical, let's say somebody had photographs of a person, you know, handing over the drugs, I mean, I know that's not the case, but in that sort of case, can a district judge refuse to give a mere presence instruction? I think the analysis is like the Ninth Circuit cases on it are, if there is some factual evidence of it, and this case is very peculiar. Well, I don't understand your answer. If there's some evidence beyond mere presence, then they don't necessarily get a mere presence instruction, is that? No, if there is some evidence supporting the defendant's theory of the case, which was mere presence. Well, that's my question. If there's other evidence in the case besides that they're standing around, if they're doing something that is quite clearly not just happening to be there, then why is there any evidence of mere presence? That case is the 1992 case of U.S. versus Vasquez. I know what the cases say. I'm trying to sort of work the logic of this. If there's other evidence in the case that suggests that the person was doing things to further the crime and was not just standing around, why is the defendant entitled to this because there's always some inferences or evidence of other things being happened, particularly in a family-centric case like this one is. And a perfect example, my client was convicted of counts 3, 4, 5, 8, and 11. On counts 4 and 5, where cocaine counts, 3 is the cocaine conspiracy, those counts, there is zero evidence of any knowledge of what was going on except in count 4, which we call the FedEx case, the conversation on June 29, 2004, in call 3909, that says where Sergio called his mother, who works in the shipping department of a company, what the shipping weight is and the breakpoint for heavyweight. And it goes back and forth. Are you sure it's not 75? No, it's 150. That has a totally innocent explanation, as well as a government inference that she knew the next day that 81 pounds of cocaine would be shipped. So that's why I get it, because there are both, there are impressions or evidence. When you're talking about a conspiracy case and you get a Pinkerton charge, that is even more important as to why you should have mere presence if for no other evidence except the substantive counts. I am telling you as a FedEx, you will go through that whole record. You will not find any evidence of any kind, including a single phone call in regards to count 5, which is the Hemperson house. But she still could be under Pinkerton, that you don't have to actually have the substantive due, but should get a mere presence as to the underlying substantive counts. And I'm out of time. Thank you. Yes, you are all out of time, but we appreciate that because it's complicated and we asked you a lot of questions. We'll hear from the government. Good morning. My name is Bruce Ferg, Assistant Attorney, used to be an Assistant Attorney General, Assistant United States Attorney on behalf of the government in this case. And I do intend to address the issues as they were raised in your order and as they've been of course, if there are questions about some of the other issues, I'm more than happy to answer those. We began with the questions of double jeopardy. And I think it's already been fairly, thoroughly thrashed out that there were in fact, what could reasonably understood as representations by at least two counsel that in their perception, the prosecutor had done nothing wrong. He vowed that this was a non-responsive question and he attempted to redirect what the agent Solis was saying. Neither of the two defense counsel who spoke at that time and made the oral motion for mistrial controverted that in fact, Mr. Higgins basically said, yep, it's not your fault. Well, the trial court was wrong in saying that the motion was timely. And it's impossible to go back, for us to go back and figure out, had the trial court known that it was timely, whether more would have been done. How do we unravel that? Because the only piece of evidence that, just speaking for myself, that was missing was asking the witness why he said what he said and nobody asked them. Well, as was suggested, no one apparently watching the trial at the time, and that's important because we are dealing with a very deferential standard of review. But neither of the two counsel who spoke, neither of the two defense counsel who did not speak controverted the suggestion and the district court from his own observation said that he, that it appeared to him that this was not a responsive answer and therefore not something to be held against the government. I wouldn't put a lot of your case based upon what counsel said at the time that the motion was originally made or the thought of the devil's jeopardy. Later on, counsel have to represent their clients and I don't think that they've stipulated or No, I agree with the issue. So I think maybe looking at your, as a matter of fact, if I were sitting there as a trial judge, I would think that just that they're saying what they think about this person, but later on they have to do their duty. The issue really is why was it untimely if the motion was brought before the second trial, why was it untimely? What was the untimeliness? Well, I think I'd have to concede that Judge Brewer was incorrect on that particular point about the timeliness and that's why I meant to put that in there. So it was a timely motion and the judge was wrong to reject it for that reason. On that grounds, yes, but he also made very specific factual findings which are really what is the crux of this issue, which is, and you can affirm for any reason in the record, as long as the right resolution of the motion was made, which is, no, there's no double jeopardy because he factually found that it was non-responsive. It was not something to be held against the government and that's important. Are you saying that once a trial judge has made a factual finding that parties can't move to reopen to provide evidence to show where he may have been clearly erroneous? Yes. If they had wanted to, they could have done that before six months passed. That was Judge Brewer's concern. Well, what is the rule that six months becomes the timeliness? I think that's the question we're asking. The judge didn't decide it's stale. The judge didn't decide, no, we're going to go on. The judge said specifically it's untimely. Now, I don't know what rule they've broken by bringing it six months later and that's why we need your help. At the time, he thought that there was a rule that had been broken as far as essentially reconsideration of rulings that had already been made and no party, including defense, alerted him to gamble or similar. Well, here's the dilemma we're in. We're here now looking back and saying a long time ago, the judge was wrong to say the motion was untimely. The judge should have looked at it then on its merits, good or bad. How do we recreate what the judge should have done? Do we send it back and ask him to think about what he would have done at that time if he'd known it was timely or what do we do? No, Your Honor. I don't think you have to go down that road at all. That's the point that I was trying to make is that really there are two bases for the denial of this motion. One is untimeliness and the other is it's simply non-meritorious and that goes back to the factual finding that the government, i.e., the prosecutor, had nothing to do with this. That is a requirement based in Oregon v. Kennedy that regardless if you have a rogue agent who takes it into his head to, quote, save the government's case, it has to be, in fact, the government prosecutor's intent in asking the question to provoke the mistrial in order to hopefully get a better second shot and that's not what happened here. Back in, even before Oregon v. Kennedy, this court has a case called Roberts where they said even grossly negligent behavior on the behalf of the government is not enough. It has to be that specific intent by the prosecutor. Now, we have not only the... If the district judge had said, it's untimely because the motion for an evidentiary hearing had to be made at the time this was before us, you didn't make it and it's waived. I could understand that. But he also, at the same time... He said that, but that isn't what he said. He said it's untimely and I've never figured out what it was untimely about. Well, as I'm recalling, and again, I was not the trial counsel, although the names sound similar. My understanding is that the pleadings suggested, frankly, that there was a timeliness issue because it did not conform to the local rule about motions for reconsideration and that's what it appeared to be, saying after the judge, without objection, had agreed that there was no timeliness. Right? Okay. So everybody... The judge mistakenly pitched the motion on timeliness grounds when it was timely. So what do we do about that? And I gather your sole argument in response to that is the judge properly found that there was no intention, which is a ruling on the merits of what the motion was. That's correct. And he repeatedly stated that. As a matter of fact, when there was a motion to stay the retrial and come before this court, he specifically found it was frivolous, referring back to his prior findings that, in fact, what had happened was not the fault of the government, that it was a non-responsive answer. And I think it's important to recollect here, as far as putting Judge Bury or anybody else on some kind of issue about it, we're not talking just about the oral, immediate responses, but that certainly is something reasonable. These are my immediate perceptions, and the defense counsel did not perceive that there was any issue. But having thought about it overnight in written pleadings in which they all stated that they were joining, although they were only written by two, they again made similar statements. It was not responsive. That it was, blurted out. There was never a suggestion that the government, i.e., the prosecutor, had done anything. I'd like to move on. Yes, ma'am. To the continuing criminal enterprise issue. And Mr. Burgos, the briefs say there's not a single recorded instruction or advice between him and, you know, how Sergio should conduct this business. And the argument has been made that you have, you know, certainly they're in a, you know, you could charge them with conspiracy, there's some joint action going on here, but where's the managerial control? And I'd like to hear from the government on that point. Well, it can be approached in either two ways. First of all, I would strongly disagree with the suggestion that there has to be immediate control, immediate supervision. Because the case law from this court and others has made the point that the whole idea of being a, quote, kingpin, or supervisor, organizer, is that they do tend to insulate themselves. And so you will be probably looking at limited contacts between the guy who's at the top and has the ability to do that. And that's where we come to what happened here. He was basically in immediate contact with and control with two suborganizations, Sergio O'Hara and the whole family, whose responsibilities was to move the marijuana once it was brought apparently by backpackers across the border. But he had stash houses and places like that. He was a transportation expert. So he would move the marijuana once it got across the border from the Nogales immediate border area to Tucson. And then it would be repackaged, either sent out by FedEx or mail or truck or all these various things. But that was an important step because of the Border Patrol outposts along Interstate 19 between the border and Tucson and so forth. So that's one kind of branch of this that Mr. Burgos is running by means of this Lieutenant Haro. The other part of it is Eddie Gonzalez, who is another kind of transportation specialist. He's got stash houses in Tucson and they are repackaging all this bulk marijuana. This is where they wrap it in cellophane, put it in the foil bags, put it in the gym bags, and then they ship it out in various means, particularly by the big rig trucks. So we have Mr. Burgos, who is running basically two operations. I know that's the argument. What's the evidence? Basically the whole case, because we have... I mean, that's the problem. It's kind of like, well, because we have all these people and they're doing all these things, therefore he is at the top of the heap. That's kind of what you're saying. I guess if you don't have to have direct control, what kind of evidence does there need to be? It's Mr. Burgos and Sergio, for example. Burgos tells Sergio, go out and rent this house because we need a stash house. He does it. Just an interesting kind of linguistic point, I noticed that if you look at all of those telephone calls that they put in the ER between Sergio and Burgos, Sergio always refers to him as sir. He never does that with anybody else. They're guy and dude. Even his is kind of a tangential inference of subservience. But basically, we are not talking about Delgado, for example, where you had a chain where there was a sale from one to another or anything like that. We have Mr. Burgos saying, I've got these thousands of pounds of marijuana. I've got to get And so he's employing the entire O'Hara organization to carry out that necessary step for him. And that's why he's responsible for all of the, quote, little people. In Delgado, it's specifically said that you can have appropriate CCE responsibility if you use, for example, the analogies of a subcontractor or of a foreman. You have your general, you have your person who's overall in charge, and he can go out and get a contractor who then gets subcontractors, and he's still responsible. You can have a man who hires a foreman, and it's specifically said that foreman then goes out and hires other people to do the work. You don't have to have direct contact of any kind. So by utilizing these suborganizations, which he certainly controlled, he was bringing his own marijuana across and saying, okay, Sergio, you and your people now need to get it from here to Tucson and then ship it out or get it into the hands of Eddie Gonzalez so he can get it shipped out. That's why he is responsible for all of those. So even if, for example, you want to look at more direct contacts, we have Sergio and Eddie Gonzalez. He's caught in telephone conversations with them, meetings with them, certainly had control of them. He also had, where was Sergio and his people actually getting the marijuana? They were getting it at the stash houses where the cars were loaded up by somebody else. Not Sergio's own people, it was Burgo's people who had these stash locations immediately on the side of the border. And those were talked about always in plural, so there's at least two more there. At the Aquino Springs stash house. On another occasion, Burgo's tells Sergio, I've got somebody who's going to give you an order. Interesting terminology. So we not only have some control, I'm giving you an order through this other person, but there's another person who's being controlled by Burgo's. There is a dispute between Sergio and a fellow named Cunado, and I'm not even sure what that means, but that's how they referred to him. And when Sergio and Cunado could not work it out, what did they do? They took it to Mr. Burgo's, and Burgo's basically interceded and sorted it out. This is reflected in the phone calls. There was an occasion where one of Sergio's people, Orlando, wanted to take the shipment to Tucson, and he was supposed to give it into the control of some of these people who were run by Burgo's, and was in fact given a phone number that Sergio had gotten from Mr. Burgo's about how to make the contact. He did, and they didn't really want to talk to him. So he talks to Sergio. Sergio says, oh, tell them it's El Senor's marijuana. Call back the same number, use that code word, because that's the way they referred to Burgo's, and voila, the door is open. Yes, bring in the marijuana now that we know who you are. So there is this overarching control where we in fact see his name being authoritatively invoked in order to bring about the purposes of the broader conspiracy. So whether you look at it strictly on the concept legally of the guy in charge who hires a contractor, who hires subcontractors or foremen, or if you look at these specific instances, yes, there is a lot of evidence there. It's not just kind of hanging out that, well, he was vaguely hanging around and had something to do with it. It's simply not that. And once again, what are we talking about here? We're talking sufficiency of the evidence. So a lot of the defense briefing on this topic seems to equate to say, well, there are a lot of innocent possible explanations for these conversations. They were really just information flowing and not orders coming back the other way. So the question for us is whether a reasonable finder of fact could have interpreted them in the government's favor. That's correct. We're talking about what could the rational jury do, and it can draw inferences. Maybe not inferences the defense likes or even inferences that this court might agree with, but if they were rational inferences, that's all that's necessary to support this conviction. And that certainly is there, that they could reasonably infer from all of the evidence, showing all these interrelationships, and even, if you will, they were listening to these phone intercepts. They not only had the transcripts, they were listening to them. Yes, well, just unless my colleagues have more questions on Mr. Burgos, I'd be interested in having you move on so that we cover all the testimony. The expert-slash-lay testimony from Amarias, I would appreciate that. I think it's important to recognize here that what Friedman says is that it can be problematic when you have different kinds of testimony that are coming from the same witness, but beyond that or kind of underlying that, none of the kinds of testimony that were being dealt with in Friedman or that occurred here are themselves inappropriate. There is much case law saying, yes, you can have an expert come in and interpret drug jargon so that the people who aren't out there on the streets buying this stuff can understand what's going on. What is the purpose of this being an expert? An expert for what? Well, it's virtually a foreign language. Pardon? What was going on in these intercepted circumstances. I didn't get that. Maybe I've misread. I thought he was purported to be an expert because he knows drug lingo and could advise the jury what these little words mean. That's where he's an expert, but then at times he begins to reinterpret testimony of people to tell the jury what it really means. Well, that's where it becomes difficult, but it's still appropriate because Friedman himself pointed out that aside from being a, quote, expert when we were basically interpreting almost foreign language. If a person purports to be an expert in one area and starts testifying as an expert in another area, then the notice problem comes up. No, because it was a lay opinion testimony, which is what Friedman... Pardon? It was a lay opinion testimony based on his experience with what was going on in the course of the investigation, which is what I was about to say is Friedman also says that's permissible. The problem is keeping it clear which is which. Well, what is which? I'm hearing you say as a lay person he could stand up there and basically say what these words meant and that he also can say that as an expert. What do you think? As an expert, he was in effect acting as an interpreter for certain kinds of words that were used particularly frequently that he had already encountered simply in his role as an agent. On the other hand, any lay person with experience about what is going on can give an opinion about what the meaning of those events were. When we're talking about, for example... Once you say he's a lay opinion and then he says he's going to testify based upon experience, he's no longer a lay witness. He becomes an expert witness. Well, I should be clear. Experience in dealing with a particular investigation that was going on, a person... We admit testimony from lay people about what their understandings of ambiguous situations are based on their understandings of the context. Let's just take one of these words, uncle or peep or target, whatever. At some point, he's basically saying, well, I figured out what this meant based on my investigation. That's testifying as a lay person? It could have been. That's where Freeman understood that it's very difficult to keep these areas separate, but they're both appropriate. The main question is, has the witness done something to take away from the jurors their appropriate resolution of what things mean? Yes, you can come in as an expert. You can say, well, based on expertise, just like a foreign language interpreter, this means this, which he did. He can also say, based on the overall context of this investigation in which he was involved from the very beginning and hearing, for example, when they talk about the old people's place, what was that? That was the Green Valley Retirement Community that was on I-19 between Nogales and Tucson. There, he was acting more in terms of a lay person, but with the further understanding of what was going on in the case to make something understandable, which is also permissible. Yes, but see, that's different than the drug warrants. It is, but as a lay person, he's not required to be announced. Here's this witness swinging in as an expert and as a lay person. And the jury is supposed to sort this out, which seems to me to be an impossible task. And as I understand it, periodically, the district judge would try and sort it out with certain instructions. And concluded that those instructions were effective, too. Did the district judge at times during the testimony try to help the jury understand when he's going to be a lay witness and when he's an expert witness? Not in so many words as saying, now he's going to become an expert, now he's going to become a lay witness. The jury was given absolutely no help during the testimony as to whether he's a lay witness now or an expert witness now. I would have to disagree because although it was not in terms of, I'm the judge instructing you as a jury, these next two paragraphs are going to be expert testimony, he was continually responding to the objections and restating, as I pointed out in my brief several different times, what was the proper parameters of the testimony. And I think it's, again, very important to recognize that how did this all play out? All of these objections, or virtually all of them, occurred on the very first day that he was testifying. And after it was sorted through and it became very clear, both to the witness and to the prosecutor, how to ask the questions and how to answer them so that there would not be draw significantly. So it was proper gatekeeping, which is all the treatment requires, to manage the trial in this way. We are talking about Agent Amory is testifying for almost 900 pages. And so you couldn't provide a dictionary in advance. You could not reasonably say, well, for the next two questions, he's going to be an expert. Clearly, it could have been done easier. He's the case agent. He can testify about that. Bring a separate person in to do the words. It isn't impossible to try one of these lawsuits without running into these. I did it when I was a trial judge. So how do we handle this? How do we handle this with the jury being literally unattended? Are you saying that the objections were responded to by the judge to clarify in each case, in each instance? Is that what you're saying? In major instances, yes. There were some that he denied because he didn't think that they were inappropriate questions. But there were parts that he specifically said, no, that answer is excluded. So it was out of their consideration. And there were, I've listed about three or four of them in the brief, specific, longer statements where he said, no, you can only testify as an expert about this kind of drug language interpretation, words to that effect. But I think ultimately, where is the prejudice? We have two different kinds of fundamentally admissible evidence. None of it has been shown to be inaccurate. See, what you come back to is that the judge had to make a decision when the original notice was given and the judge made you have enough notice. He's saying that with the Rule 16 notice and with the trial brief, you know enough. But did they know enough to know what was going to happen the way this falls out of mixing up a lay witness with an expert witness during the time of the witnesses on the stand? I would suggest that they did. Because again, lay testimony, lay opinion testimony is not something that has to be disclosed or summarized in advance. So to the extent that he was talking about expert testimony, the judge did specifically find that it was sufficient. So all they really had to say is they're going to talk about drug code words. That's sufficient notice? It's only a summary that's required. That's a pretty short summary. And that's why it comes down to the discretion of the district court judge about what is sufficient and how to manage the trial. The way he was managing his trial is how do you make sense of this incredible amount of information? And so the basic order was chronological. This event or this transaction went down first, second, third, fourth. And so it is possible to keep track of it. And also this goes to the whole question of severance. They were given these notebooks which were specifically organized for the jury's purposes by defendant, by count, and so forth so they could keep it all in order. Before you get out of the way of gunfire and retreat to a safer place, I wanted to ask you about your response to the idea that we have to vacate either the CCE or the conspiracy for Mr. Burgos because one is necessarily implicated in the other. I got it from your reading that there's sort of what Judge Graber referred to earlier as a soft confession, that we have to rid ourselves of one or the other. If you affirm the CCE conviction, which I hope you will, then yes. Actually, my reading of the case law is not that you would do it, but that you agree that it has to be done. But you see, that's the next question I wanted to ask you. Why should that be our responsibility? Why wouldn't that be the responsibility of the district judge? That is, why wouldn't we vacate both and send them back and let the judge make a determination as to which is going to be dismissed and which will then become the sentence? Then you'll have to re-sentence at least to the extent to tell us what difference it makes. Not necessarily, but I believe that I did cite this Court's precedents indicating that that's appropriate. If they both come up here and you affirm both, then the appropriate remedy is to remand to the district court then to decide what to do about which one. You see, the difficulty is in sentencing defendants. I know from personal experience, so it isn't fair, but I might as well tell you what's on my mind. If they're convicted for two, the sentence is a little different than it is if they're convicted of one. I'm just wondering whether or not, in fairness, we don't have to vacate both of them and let the trial judge make this decision and to indicate whether he wants to re-sentence based upon one of the convictions disappearing. Well, again, my reading of the cases and the names escaping that they're in the brief was that this Court has already said it's not for you to vacate. It's rather for you to remand both after affirming them, and then it's for the district court to decide what it wants to do. Well, either way, it goes back. It sounds like you're, in a way, I think that that seems to be what Hector, at least, did was to let the district court decide which one should be kept. Now, you have run out of time, but I'd like you to briefly respond, if Judge Wallace is finished with that, to ask about your response to the mere presence instruction request from Lorena. I think that to properly understand this, we have to recognize that we're really kind of talking about two different situations. When does this kind of mere scintilla or mere modicum of evidence that will support a mere presence instruction sufficient? When that's all that there is. Yes, the defendant is able to put his or her theory of the case in front of the jury in those terms if, in fact, he shows really there's just enough to show mere presence. But if there is more evidence than that, and this Court's precedents are very clear, that when it's obvious that there is much more than mere presence, it's not really even meaningfully arguable, then it's not appropriate to give that kind of an instruction. It's kind of a threshold decision issue, I suppose you could put it. Is there enough to get from the instruction and no more? But if there is more, then they don't get it. It's kind of what it would come down to. And there certainly was considerably more, both on Julio and on Lorena, which I laid out in the briefs. Lorena, in particular, that was the one that was argued. What is she doing? She's running around taking bundles of money across the border to the usual woman, is the way she was referred to. And it turned out on one occasion that actually Mr. Burgos received the money. She is going to Tucson to bring Sarah Sainz, the cocaine cross-border smuggler, down to Nogales. And what does she do? On one occasion in particular, she hands her this big clear plastic bag of money, or at least shows it to her and says, hey, take this back across the border into Mexico, and stuffs it into the compartment in the BMW. Sarah drives it across, gets cocaine, brings it back. She complains to Sergio. One time he's not so sure that he wants to use her to take money across the border. And she says, let me work. Let me work. Let me do it. So this is not somebody who is merely present in any sense of the word. And again, these full concepts were repeatedly covered. First of all, in each of the conspiracy instructions, and the aiding and abetting instruction, and the possession instruction. So it was abundantly covered repeatedly. As a matter of fact, I think it was the Reid case I pointed out, says if you cover it in the conspiracy, you don't need any other instruction along this line. So mere presence was abundantly covered. I've not heard the defendant suggest how what was told to the jury was insufficient. What kind of superior wording there would have been that would have made a difference. It was adequately covered. Thank you, counsel. Now, we did use everybody's time, but it's a complicated case, so we'll go ahead and give you rebuttal. I don't know who wants to handle that. Okay. Don't all jump up at once. We're so much fun to talk to. Come on. Or you may wave. It's certainly up to you. Okay. Thank you. I just wanted to point out that Judge Bury on a couple of occasions actually stated to Agent Amadeus, you're invading the province of the jury. You can't talk about what people are thinking, and you can't do this under the guise of drug speak, I think was the term that Judge Bury used. Did the judge say that in front of the jury? I don't believe so. My memory is that there were a couple of occasions where he would excuse the jury for like a morning break and then hold counsel and the witness there and talk. There was another occasion where we actually had a bench conference, I think, at which the witness was asked to come over and talk. That's my memory of it. But we certainly never, never had the kind of bifurcation that Antrim talks about, the most recent decision by this Court. So at a bare minimum, that would have helped a little, but it doesn't solve the Rule 16 lack of disclosure. And on gathering in Antrim, there never was a Rule 16 issue, at least it's not mentioned in the opinion. Thank you. Thank you, counsel. Well, we appreciate the arguments of all counsel. You've all done a very, very good job with a lot of material, and the case just argued is submitted with our thanks. And we will stand adjourned for this morning's session.
judges: Wallace, Graber, McKeown